1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7

8

9

10

11

12

RICHARD RODRIGUEZ,

Plaintiff,

v.

BELFOR USA GROUP, INC., et al.,

Defendants.

Case No.  22-cv-02071-VKD

**ORDER DENYING MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITHOUT PREJUDICE**

Re: Dkt. Nos. 39, 47

13

14          Plaintiff Richard Rodriguez asserts claims under the Fair Labor Standards Act, 29 U.S.C. §

15   201, *et seq.* ("FLSA"), the California Private Attorneys' General Act, California Labor Code §

16   2698, *et seq.* ("PAGA"), and other California state labor laws on behalf of himself and others

17   similarly situated against his former employers, defendants Belfor USA Group, Inc., Belfor

18   Environmental, Inc., Oakwood Construction and Restoration Services, Inc., and 1 800 Water

19   Damage North America, LLC (collectively "defendants").  *See* Dkt. No. 27.  Mr. Rodriguez asks

20   the Court for preliminary approval of a class, collective, and representative action settlement

21   agreement.  Dkt. Nos. 39, 47.  Defendants do not oppose this motion.  *See* Dkt. No. 40.[1]

22          The Court held a hearing on the motion on January 23, 2024 (Dkt. No. 43) and afterwards

23

24   ──────────────

25   [1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  Dkt. Nos. 7, 8; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  Mr. Rodriguez also named several placeholder Doe defendants in his complaint.  *See* Dkt. No 1 ¶ 10.

26   However, placeholder Doe defendants are not "parties" for purposes of assessing whether there is complete consent of all parties to magistrate judge jurisdiction.  *Geppert v. Doe 1*, No. 23-cv-

27   03257-SVK, 2023 WL 5804156, at *1 n.2 (N.D. Cal. Sept. 7, 2023); *RingCentral, Inc. v. Nextiva, Inc.*, No. 19-cv-02626-NC, 2020 WL 978667, at *1 n.1 (N.D. Cal. Feb. 28, 2020); *see also*

28   *Williams v. King*, 875 F.3d 500, 502-05 (9th Cir. 2017).

United States District Court
Northern District of California

1     issued an order directing Mr. Rodriguez to file a supplemental submission addressing specific

2     issues the Court identified (Dkt. No. 44).  In response, Mr. Rodriguez filed a supplemental

3     memorandum, declarations of Julie Green, an employee of the proposed settlement administrator

4     CPT Group, and Raul Perez, one of Mr. Rodriguez's attorneys, and an amended settlement

5     agreement.  *See* Dkt. No. 47 (supplemental submission); Dkt. No. 47-1 (Green declaration); Dkt.

6     No. 47-2 (Perez declaration); Dkt. No. 47-2 at ECF 18-41 (amended settlement agreement).  Upon

7     consideration of the moving papers and the arguments made at the hearing, the Court denies the

8     motion for preliminary approval of the amended settlement agreement, without prejudice to the

9     filing of a renewed motion addressing the deficiencies identified in this order.

10    **I.    BACKGROUND**

11        Defendants provide property recovery and restoration services for properties damaged by

12    natural disasters, such as fires and floods, on a nationwide basis.  Dkt. No. 27 ¶ 21.  The four

13    named corporate defendants are wholly owned by the same parent corporation, share corporate

14    officers, and operate out of a single headquarters in Birmingham, Michigan.  Dkt. No. 4; Dkt. No.

15    27 ¶¶ 20-21.  Mr. Rodriguez was employed by defendants as a non-exempt "Water Damage

16    Specialist – Laborer" from approximately March of 2020 to December of 2021.  *Id.* ¶ 5.  While

17    Mr. Rodriguez worked for defendants only in California, he contends that their employment

18    policies were uniform across the country and were implemented by central human resources and

19    payroll departments in Michigan.  *Id.* ¶¶ 5, 21-23.

20        Mr. Rodriguez claims that during his employment, defendants violated the FLSA and

21    California labor law by, among other things: (1) requiring unpaid overtime work; (2) failing to

22    provide timely meal periods during the workday; (3) failing to provide paid rest periods during the

23    workday; (4) requiring the use of personal cell phones for business purposes; and (5) requiring

24    workers to report for scheduled shifts, but sending them home unpaid if no work was available.

25    *See id.* ¶¶ 68-163.  In the operative complaint, Mr. Rodriguez asserts claims for: (1) violations of

26    the FLSA (unpaid overtime and minimum wages, meal and rest period violations, failure to keep

27    accurate records of all hours worked); (2) violations of California Labor Code §§ 510 and 1198

28    (unpaid overtime); (3) violations of California Labor Code §§ 1182.12, 1194, 1197, 1197.1, and

United States District Court
Northern District of California

United States District Court
Northern District of California

1198 (unpaid minimum wages); (4) violations of California Labor Code §§ 226.7, 512(a), 516, and 1198 (meal period violations); (5) violations of California Labor Code §§ 226.7, 516, and 1198 (rest period violations); (6) violations of California Labor Code §§ 226(a), 1174(d), and 1198 (non-compliant wage statements and failure to maintain accurate payroll records); (7) violations of California Labor Code §§ 201 and 202 (wages not timely paid upon termination); (8) violations of California Labor Code § 204 (failure to timely pay wages during employment); (9) violations of California Labor Code § 1198 and California Code of Regulations Title 8, § 1160 Subdivision 5(B) (failure to provide reporting time pay); (10) violations of California Labor Code § 2802 (unpaid business-related expenses); (11) civil penalties pursuant California Labor Code § 2698, *et seq.* (PAGA); (12) violations of California Business & Professions Code § 17200, *et seq.* (unlawful business practices); and (13) violations of California Business & Professions Code § 17200, *et seq.* (unfair business practices). *Id.* ¶¶ 68-210.

This action was filed initially in Santa Clara County Superior Court, but was removed by defendants on March 31, 2022. *See* Dkt. No. 1. Shortly thereafter, defendants moved to strike the class allegations in Mr. Rodriguez's complaint and to dismiss most of his claims for failure to state a claim. Dkt. No. 5. On June 6, 2022, the Court denied the motion to strike in full and denied the motion to dismiss as to all but one of Mr. Rodriguez's claims. *See* Dkt. No. 15. It granted defendants' motion to dismiss as to Mr. Rodriguez's unpaid reporting or "on-call" time claim, but gave him leave to file an amended complaint with additional allegations. *Id.* at 12, 15. Mr. Rodriguez filed an amended complaint on July 25, 2022. Dkt. No. 27.

After completing some discovery, on June 23, 2023, the parties participated in a mediation with mediator Louis Marlin. Dkt. No. 39-1 ¶¶ 4, 6-8. As a result of that mediation, they reached a settlement of the class action, FLSA collective action, and PAGA claims. The parties executed a settlement agreement on November 13, 2023. *Id.* at ECF 10-33.

In response to the Court's request for a supplemental submission, the parties filed an amended settlement agreement on March 8, 2024. *See* Dkt. No. 47. Unless otherwise specified, the Court's references to the "settlement" or "settlement agreement" in this order refer to the amended settlement agreement.

United States District Court
Northern District of California

## II.    PROPOSED SETTLEMENT

### A.    Structure of the Settlement

The proposed settlement agreement encompasses claims relating to three categories of employees.

First, the settlement defines a "settlement class" consisting of "all persons who were employed by Defendants in the State of California in non-exempt positions at any time during the period from February 25, 2018 to the date of Preliminary Approval." Dkt. No. 47-2 at ECF 20 (¶ 5). The Court will refer to this as the "California class" in this order. Mr. Rodriguez estimates that there are 473 members in the California class. *Id.*

Second, the settlement identifies an FLSA collective consisting of "all persons who were employed by Defendants in the United States of America in non-exempt positions at any time during the period from February 25, 2019 to the date of Preliminary Approval." *Id.* at ECF 21 (¶ 13). Mr. Rodriguez estimates that there are 3,970 members in the FLSA collective. *Id.*

Third, the settlement includes a PAGA settlement amount for members consisting of "all persons who were employed by Defendants in the State of California in non-exempt positions at any time during the period from March 8, 2021 to the date of Preliminary Approval." *Id.* at ECF 22 (¶ 23). Mr. Rodriguez estimates that there are 236 PAGA members, all of whom are—by definition—also members of the California class. *Id.*

The settlement provides that defendants will pay a non-reverting "gross settlement amount" of $1,200,000 to be distributed amongst the members of the three employee categories, their attorneys, the settlement administrator, and Mr. Rodriguez. *Id.* at ECF 21-22 (¶ 19).

#### 1.    California Class

The largest share of the monetary relief, referred to as the "net settlement fund," will be distributed to the members of the California class. It is defined as "the portion of the [g]ross [s]ettlement [a]mount remaining after deducting the Attorneys' Fees and Costs, Class Representative Enhancement Payment, PAGA Settlement Amount, FLSA Settlement Fund, and Settlement Administration Costs." *Id.* at ECF 22 (¶ 21). The parties expect the value of the net settlement fund to be approximately $465,000. *Id.* at ECF 25-26 (¶ 41). This amount will be

4

distributed to the members of the California class who do not affirmatively opt out of the settlement agreement, in proportion to the number of weeks each member worked for defendants during the class period. *Id.* at ECF 27-28 (¶ 49(a)). If some members of the California class opt out, then the remaining members' distributions will be proportionally increased, so that 100% of the net settlement fund will be distributed to the California class. *Id.* The settlement administrator will deduct any applicable employee-side payroll taxes from the class members' payments and ensure they are paid to the appropriate authorities. *Id.* at ECF 27-28, 34 (¶¶ 49(a), 72). Additionally, if any class members' settlement checks remain uncashed 180 days after being issued, the remaining funds will be donated to Worksafe, a workplace safety non-profit organization. *Id.* at ECF 34 (¶ 69); *see also* https://worksafe.org/.

In return for this relief, California class members who do not opt out will release defendants from "all claims, rights, demands, liabilities, and causes of action, reasonably arising from, or reasonably related to, the same set of operative facts as those set forth in the operative complaint during the Class Period," including: "(1) [California Labor Code s]ections 510 and 1198 (unpaid overtime); 23) [s]ections 1182.12, 1194, 1197, 1197.1, and 1198 (unpaid minimum wages); (3) [s]ections 226.7, 512(a), 516, and 1198 (failure to provide meal periods); (4) [s]ections 226.7, 516, and 1198 (failure to authorize and permit rest periods); (5) [s]ections 226(a), 1174(d), and 1198 (non-compliant wage statements and failure to maintain payroll records); (6) [s]ections 201 and 202 (wages not timely paid upon termination); (7) [s]ection 204 (failure to timely pay wages during employment); (8) [s]ection 1198 and California Code of Regulations Title 8, section 11160 Subdivision 5(B) (failure to provide reporting time pay); (9) [s]ection 2802 (unreimbursed business expenses); (10) California Business & Professions Code sections 17200, *et seq.* (unlawful business practices); and (11) California Business & Professions Code sections 17200, *et seq.* (unfair business practices)." *Id.* at ECF 15 (¶ 30).

### 2. FLSA Collective Action

The settlement agreement also creates an "FLSA settlement fund" of $165,000. *Id.* at ECF 21 (¶ 18). This amount will be distributed to members of the nationwide FLSA collective who affirmatively opt in to the settlement agreement. *Id.* at ECF 21, 28-29 (¶¶13-18, 49(c)). As with

5

the net settlement fund for the California class, the FLSA settlement fund will be distributed among the participating members in proportion to the number of weeks they worked during the class period, so that 100% of the FLSA settlement fund will be distributed.  *Id.* at ECF 28-29 (¶ 49(c)).

In return for this relief, the members of the FLSA collective who participate in the settlement agreement will release defendants from "all claims arising under the Fair Labor Standards Act, both known and unknown, which were asserted or could reasonably have been asserted in the Action based on the facts alleged, including, but . . . not limited to, any claim for failure to pay overtime wages, minimum wages, unpaid wages, and failure to pay overtime wages at the regular rate of pay during the FLSA Period."  *Id.* at ECF 23-24 (¶ 31).  If any FLSA collective members' settlement checks remain uncashed 180 days after being issued, the remaining funds will be donated to Worksafe.  *Id.* at ECF 34 (¶ 69).

### 3. PAGA Settlement

The settlement agreement provides for $100,000 to be allocated to a settlement of the PAGA claims.  *Id.* at ECF 22-23 (¶ 25).  Of that amount, 75% or $75,000 will be paid to the California Labor and Workforce and Development Agency ("LWDA").  *Id.*  The remaining 25% or $25,000 will be distributed to the PAGA members in proportion to the number of weeks each member worked during the PAGA period.  *Id.* at ECF 23-24, 28 (¶¶ 25, 49(b)).  However, unlike the California class, PAGA members are not permitted to exclude themselves from this part of the settlement or to object to it.  *Id.* at ECF 26-27 (¶ 45).

If approved, the PAGA settlement will release defendants from "all claims for civil penalties under California Labor Code [§] 2698, *et seq.*, that were brought or could reasonably have been brought based on the facts alleged in Plaintiff's LWDA letter during the PAGA Period."  *Id.* at ECF 24 (¶ 32).  If any PAGA members' settlement checks remain uncashed 180 days after being issued, the remaining funds will be donated to Worksafe.  *Id.* at ECF 34 (¶ 69).

United States District Court
Northern District of California

**4.      Attorneys' Fees, Settlement Administration, and Class Representative Enhancement Payment**

In addition to the payments associated with the three employee categories described above, the settlement agreement provides for payment to class counsel, the settlement administrator, and Mr. Rodriguez.

The agreement allows Capstone Law APC, the law firm that represents Mr. Rodriguez in this action and that now requests appointment as class counsel, to move for an award attorneys' fees not in excess of $400,000 or one third of the gross settlement amount. *Id.* at ECF 19 (¶ 2). The agreement provides that counsel may also seek to recover costs of up to $30,000. *Id.*

Additionally, the settlement agreement allocates up to $30,000 in "settlement costs" to be paid to the settlement administrator. *Id.* at ECF 24-25 (¶ 36). After soliciting bids from three candidates, the parties selected CPT Group, Inc. to administer the settlement. Dkt. No. 39-1 ¶¶ 11-12.

Finally, the agreement allows for Mr. Rodriguez to apply to the Court for a class representative enhancement or incentive payment of $10,000, in addition to the amount he will otherwise receive as a member of the California class, the FLSA collective, and the PAGA settlement. Dkt. No. 47-2 at ECF 26 (¶ 42).

**B.      Notice to Members**

The settlement agreement requires defendants to compile a list, including the names, contact information, dates of employment, and number of weeks worked for each member of each employee category, within 20 calendar days of preliminary approval by the Court. *Id.* at ECF 19-20 (¶ 4). Within 10 calendar days of receiving the list, the settlement administrator must mail notices to all members of the California class and FLSA notices to all members of the FLSA collective. *Id.* at ECF 29 (¶ 53). The California class notice also describes the PAGA settlement. *See id.* at ECF 44-45. Draft notices are attached to the settlement agreement as exhibits. *Id.* at ECF 43 (California class notice), ECF 49 (FLSA notice).

The members of the California class will have 45 days from the date of mailing to exclude themselves from the settlement or object to it in writing, while members of the FLSA collective will have 45 days to opt in to the settlement. *Id.* at ECF 24 (¶ 35). They may do so either by

United States District Court
Northern District of California

1  email or by U.S. mail, in which case the letter must be postmarked by the deadline.  *Id.*  Members

2  of both groups will also be able to challenge the accuracy of their dates of employment or weeks

3  worked by the same deadline.  *Id.* at ECF 24, 30-31 (¶¶ 35, 57).

4       The settlement administrator will be responsible both for checking the accuracy of the

5  address information in the list provided by defendants and for taking additional steps to determine

6  the addresses of any members whose notice is returned as undeliverable.  *Id.* at ECF 29-30 (¶ 54).

7  If the administrator sends the notice to a second address, then the member will be able to respond

8  by either the original response deadline or shall have an additional 15 days from the second

9  mailing, whichever is later.  *Id.*  Additionally, if a member's request for exclusion or to opt in is

10  defective, then the settlement administrator is required to mail the member a letter explaining the

11  defects.  *Id.* at ECF 31 (¶ 58).  Members will receive extra time to respond to these letters.  *Id.*

12       The agreement provides that no earlier than 30 days after the deadline to respond to the

13  notices, the Court will hold a final fairness hearing on the settlement agreement.  *Id.* at ECF 36

14  (¶ 78).  Members of the California class who object to the settlement may appear in person at the

15  hearing, and the Court may also consider written objections submitted prior to the response

16  deadline.  *Id.* at ECF 33 (¶ 66).

## III.   LEGAL STANDARD

### A.   Rule 23 Class Action Settlements

19       Court approval is required for the settlement of Rule 23 class actions.  *See* Fed. R. Civ. P.

20  23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

21  purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the

22  court's approval.").  The Ninth Circuit has declared that a strong judicial policy favors settlement

23  of Rule 23 class actions.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

24  However, no presumption of fairness applies to such settlements.  *Roes v. SFBSC Mgmt., LLC*,

25  944 F.3d 1035, 1049 (9th Cir. 2019).  And where the parties reach a settlement before class

26  certification, courts must "employ[] extra caution and more rigorous scrutiny," *id*., and "peruse the

27  proposed compromise to ratify both the propriety of the certification and the fairness of the

28  settlement," *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *see also In re Bluetooth*

1   *Headset Products Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("Prior to formal class

2   certification, there is an even greater potential for a breach of fiduciary duty owed the class during

3   settlement.  Accordingly, such agreements must withstand an even higher level of scrutiny for

4   evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)

5   before securing the court's approval as fair.").

6          In considering Mr. Rodriguez's motion for preliminary approval, the Court must first

7   assess whether a class exists.  *Staton*, 327 F.3d at 952.  Second, the Court must assess whether the

8   proposed settlement is "fundamentally fair, adequate, and reasonable," considering "the settlement

9   taken as a whole, rather than the individual component parts, that must be examined."  *Id.* (cleaned

10  up).

11         **B.     FLSA Collective Action Settlements**

12         Court approval is also required for settlements of private collective actions under the

13  FLSA.  *Seminiano v. Xyris Enter., Inc.*, 602 F. App'x 682, 683 (9th Cir. 2015) (citing *Nall v. Mal-*

14  *Motels, Inc.*, 723 F.3d 1304, 1306 (11th Cir. 2013)).  Although "[c]ollective actions [under the

15  FLSA] and class actions [under Rule 23] are creatures of distinct texts . . . that impose distinct

16  requirements," *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1101 (9th Cir. 2018), district

17  courts assess FLSA settlements using a two-step process that is similar to what is required for

18  review of class action settlements under Rule 23.  *See Kulik v. NMCI Med. Clinic Inc.*, No. 21-cv-

19  03495-BLF, 2023 WL 2503539, at *3 (N.D. Cal. Mar. 13, 2023).

20         First, the Court must assess whether the members of proposed collective are "similarly

21  situated" and may proceed in a collective action.  *Id.*; *see also Campbell v. City of Los Angeles*,

22  903 F.3d at 1117.  Second, the Court must assess whether the proposed settlement is "a fair and

23  reasonable resolution of a bona fide dispute over FLSA provisions."  *Otey v. CrowdFlower, Inc.*,

24  No. 12-cv-05524-JST, 2014 WL 1477630, at *3 (N.D. Cal. Apr. 15, 2014) (quoting *Lynn's Food*

25  *Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982)).

26         **C.     PAGA Settlements**

27         Court approval is likewise required for settlements of PAGA claims.  Cal. Lab. Code

28  § 2699(l)(2).  The proposed settlement must also be submitted simultaneously to LWDA.  *Id.*  "An

United States District Court
Northern District of California

9

1    employee bringing a PAGA action does so as the proxy or agent of the state's labor law

2    enforcement agencies, . . . who are the real parties in interest." *Sakkab v. Luxottica Retail N. Am.

3    *Inc.*, 803 F.3d 425, 435 (9th Cir. 2015) (cleaned up).  "Accordingly, a judgment in a PAGA action

4    binds not only the plaintiff, but also the government and nonparty aggrieved employees."

5    *Eisenacher v. VITAS Hospice Servs. LLC*, No. 20-cv-04948-RS, 2021 WL 1846574, at *2 (N.D.

6    Cal. Apr. 2, 2021).  Even so, PAGA settlements "[do] not require class action procedures, such as

7    notice and opt-out rights."  *O'Connor v. Uber Techs.*, 201 F. Supp. 3d 1110, 1134 (N.D. Cal.

8    2016).

9         While court approval of PAGA settlements is statutorily required, PAGA does not provide

10   express guidance about the scope or nature of judicial review.  In the absence of binding guidance,

11   federal district courts reviewing PAGA settlements have drawn on factors utilized by the Ninth

12   Circuit to evaluate whether a class action settlement is fundamentally fair, adequate, and

13   reasonable.  *See id* at 1133-34 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.

14   1998)); *see also Moniz v. Adecco USA, Inc.*, 72 Cal. App. 5th 56, 77 (2021) ("[A] trial court

15   should evaluate a PAGA settlement to determine whether it is fair, reasonable, and adequate in

16   view of PAGA's purposes to remediate present labor law violations, deter future ones, and to

17   maximize enforcement of state labor laws.").  "These factors are evaluated in light of PAGA's

18   public policy goals of 'benefit[ing] the public by augmenting the state's enforcement capabilities,

19   encouraging compliance with Labor Code provisions, and deterring noncompliance.'"

20   *Eisenacher*, 2021 WL 1846574, at *2 (quoting *O'Connor*, 201 F. Supp. 3d at 1132-33).

21   **IV.    DISCUSSION**

22        The Court first considers whether certification of the California class and the FLSA

23   collective is warranted.  It then discusses whether the settlement is fair, reasonable, and adequate.

24        **A.    Class and Collective Certification**

25             **1.    California class**

26        Plaintiffs bear the burden of establishing, by a preponderance of the evidence, that class

27   certification is appropriate under Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

28   (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with

United States District Court
Northern District of California

the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.") (emphasis in original).  To do so, plaintiffs must satisfy the four prerequisites under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation, Fed. R. Civ. P. 23(a); *see also Dukes*, 564 U.S. at 349, and show that at least one of the bases for certification under Rule 23(b) is met.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Here, Mr. Rodriguez seeks certification under Rule 23(b)(3) and therefore must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Rule 23's requirements "demand undiluted, even heightened, attention" when a proposed class is to be certified only for the purposes of settlement.  *Amchem Prods.*, 521 U.S. at 620.

### a.   Rule 23(a) certification

#### i.   Numerosity

Rule 23(a)(1) requires that the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  While there is no fixed number for this requirement, courts generally find that the numerosity requirement is satisfied where the class consists of 40 or more members.  *In re Facebook, Inc. PPC Advertising Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).  The numerosity requirement is met here, as there are approximately 473 members in the California class.  Dkt. No. 47-2 at ECF 20 (¶ 5).

#### ii.   Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A question of fact is common where "it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  However, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id.* (cleaned up).  "All questions of fact and law need not be common to satisfy the

United States District Court
Northern District of California

commonality requirement.  The existence of shared legal issues with divergent factual predicates is sufficient." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 807 (9th Cir. 2020) (cleaned up); *see also Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 297 (N.D. Cal. 2022) (quoting *Sotelo v. MediaNews Grp., Inc.*, 207 Cal. App. 4th 639, 654 (2012)) ("'[A] class may . . . establish liability by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work overtime hours without overtime pay' or will receive less than minimum wage per hour of work."); *Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 321 (N.D. Cal. 2013) (concluding that the commonality requirement was satisfied where plaintiffs contended that all non-exempt employees were subject to the same wage and hour policies and practices).  A single common question of fact or law is sufficient to satisfy Rule 23(a)(2).  *Dukes*, 564 U.S. at 359.

Here, Mr. Rodriguez alleges that defendants applied uniform wage-and-hour policies to their employees across the country and particularly to their employees in California.  *See, e.g.*, Dkt. No. 27 ¶¶ 21-23.  He contends that resolution of the class claims depends on common questions of law and fact regarding the class members' employment by defendants, including: (1) whether defendants failed to pay class members the minimum wage for the hours they worked; (2) whether defendants failed to provide meal periods or to compensate class members for missed meal periods; (3) whether defendants failed to provide rest periods or to compensate class members for missed rest periods; (4) whether defendants failed to reimburse class members for business expenses; and (5) whether defendants failed to compensate class members for "on call" time.  Dkt. No. 39 at 9-14.

It is not entirely clear from the operative complaint or the motion papers whether Mr. Rodriguez contends that defendants maintained uniform written policies that gave rise to these claims, or whether, despite facially valid policies, defendants nevertheless engaged in uniform practices that gave rise to these claims.  *See id.* at 9-14 (referring to "uniform" policies that "in practice" resulted in wage-and-hour violations).  "Proving at trial whether such informal or unofficial policies existed" may be a common question.  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1166 (9th Cir. 2014).  However, a plaintiff must provide some evidence that the policy in

United States District Court
Northern District of California

question existed.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) ("If there is no evidence that the entire class was subject to the same allegedly discriminatory practice, there is no question common to the class.").  When pressed during hearing, Mr. Rodriguez's counsel explained that defendants had a common practice of "pressuring" or "encouraging" class members to work in a manner that deviated from defendants' written policies.  Dkt. No. 43.  Mr. Rodriguez provides little factual support for his allegations (many of which are made solely on information and belief) that, like him, all class members were subjected to these unlawful practices.  However, while Mr. Rodriguez's class allegations are limited, and the pre-settlement investigation of the factual bases for these allegations was also limited (*see* Dkt. No. 39-1 ¶¶ 6-9), the parties' principal dispute appears to be whether the unlawful practices existed—a question that concerns the merits of the asserted claims—and not whether the allegedly unlawful practices impacted all class members.  *See Jimenez*, 765 F.3d at 1166 ("[Defendant] argues that its formal policies which call for employees to be paid for all overtime worked are lawful, and that the alleged informal 'policy-to-violate-the-policy' does not exist.  This argument is appropriately made at trial or at the summary judgment stage, as it goes to the merits of the plaintiffs' claim.").

Accordingly, while the question is close, the Court finds that the allegations of the operative complaint and the representations made by both sides at the hearing support Mr. Rodriguez's position that the commonality requirement is met with respect to the California class.

### iii.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class," and the "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (cleaned up).

Here, while the same concerns discussed above regarding the commonality requirement apply to the Court's consideration of the typicality requirement, this requirement also appears to

be met.  Mr. Rodriguez, the sole named plaintiff, worked for defendants as a non-exempt employee—like every other class member—and claims to have been subjected to the same unlawful employment practices as every other class member.  *See* Dkt. No. 27 ¶¶ 5, 21-23; Dkt. No. 47-2 at ECF 20 (¶ 5); *see also Tijero*, 301 F.R.D. at 322 (concluding that the typicality requirement was met where plaintiffs sought to represent all non-exempt employees that were not properly compensated due to defendant's policies and practices).

Accordingly, the typicality requirement is satisfied.

### iv.    Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In assessing this factor, the Court addresses two questions: (1) whether plaintiff and his counsel have any conflicts of interest with other class members, and (2) whether plaintiff and his counsel will prosecute the action vigorously on behalf of the class.  *Staton*, 327 F.3d at 957.

As to the first factor, Mr. Rodriguez's interests appear to be aligned with those of the California class.  He shares the same grievances as the class and has the same interests as the absent class members in obtaining redress from defendants as to the claims addressed by the settlement.  The settlement does allow Mr. Rodriguez to apply for a $10,000 incentive award.  Dkt. No. 47-2 at ECF 26 (¶ 42).  However, this award is not guaranteed and must be approved by the Court, *see id.*, which, as discussed further in section IV.B.1.d, will depend on the Court's independent assessment of his entitlement to an incentive payment.  Additionally, the Court perceives no conflict between Capstone Law, APC, the proposed class counsel, and the class.

As to the second factor, there do not appear to be any issues with Mr. Rodriguez's or Capstone Law's prosecution of the action on behalf of the class.  Raul Perez, a partner with Capstone Law, avers that the firm has extensive experience litigating wage-and-hour claims, class and representative actions, and PAGA enforcement actions.  Dkt. No. 39-1 ¶¶ 14-21.  He also reports that the firm, along with Mr. Rodriguez, has conducted an investigation of the facts surrounding the claims in this action, including interviews with Mr. Rodriguez and review of his employment records, and review of document discovery produced by defendants.  *Id.* ¶¶ 6-9.

Capstone Law has also responded to a motion to dismiss filed in this Court and negotiated on behalf of the class in mediation.  *See* Dkt. No. 11; Dkt. No. 39-1 ¶ 4.

For these reasons, the Court concludes that the adequacy requirement is satisfied.

### b.    Rule 23(b)(3) certification

Mr. Rodriguez asks the Court to certify the proposed class under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Based on its review of the record, the Court concludes that the predominance and superiority requirements are met.

### i.    Predominance

The "predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation," and "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Id.* (cleaned up).  "'[P]redominance in employment cases is rarely defeated on the grounds of differences among employees so long as liability arises from a common practice or policy of an employer.'"  *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 938 (9th Cir. 2019) (quoting 7 Newberg on Class Actions § 23:33 (5th ed. 2012)).

In the present case, Mr. Rodriguez satisfies the predominance inquiry because the central issues in the action, defendants' allegedly unlawful wage and hour practices, apply to all class members.

### ii.    Superiority

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," courts consider four nonexclusive factors: (1) the class

members' interest in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the controversy in the particular forum; and (4) the difficulties likely to be encountered in managing a class action.  Fed. R. Civ. P. 23(b)(3).

The proposed class here meets the superiority requirement.  Permitting the case to proceed as a single class action is an efficient use of the Court's and the parties' resources and the most expeditious way to resolve common questions about defendants' alleged wage and hour practices.  Further, the present forum is appropriate, and there are no obvious difficulties in managing this case as a class action for purposes of approval and administration of the settlement.

* * *

Accordingly, the Court concludes that Mr. Rodriguez has demonstrated that the California class satisfies the requirements of Rule 23.

### 2.      FLSA Collective Action

The FLSA allows employees to bring suit "for and in behalf of himself or themselves and other employees similarly situated," provided that the additional employees "give[] consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).  This statute "imposes a lower bar [for certification] than Rule 23." *Campbell v. City of Los Angeles*, 903 F.3d at 1112.  "Party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Senne*, 934 F.3d at 948 (quoting *Campbell v. City of Los Angeles*, 903 F.3d at 1117).  "[A]s long as the proposed collective's 'factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment.'" *Id.* (quoting *Campbell v. City of Los Angeles*, 903 F.3d at 1117).  This standard will be met when "plaintiffs allege a single, FLSA-violating policy . . . and argue a common theory of defendants' statutory violations." *Id.* at 949.

The allegations supporting Mr. Rodriguez's FLSA claim are similar to those supporting his California law claims.  He alleges that defendants engaged in company-wide practices which

required members of the collective "to regularly work off-the-clock before and after scheduled shifts, during unpaid meal periods, and for mandatory drug tests and/or physical examinations." Dkt. No. 27 ¶¶ 74-80.  While the FLSA collective is much larger than the California class and includes employees located across the country, Mr. Rodriguez alleges—and defendants do not contest—that defendants' policies and practices were created and implemented by centralized human resources and payroll departments in defendants' Michigan headquarters.  *Id.* ¶¶ 21-23.  In these circumstances, the Court concludes that the contents and legality of defendants' policies and practices present similar issues of law or fact material to the disposition of the FLSA claim.  *See Senne*, 934 F.3d at 948.

Accordingly, the Court concludes that Mr. Rodriguez has demonstrated that the members of the FLSA collective are similarly situated to each other.

### B.  Preliminary Approval of the Settlement

The preliminary approval analyses under Rule 23, the FLSA, and PAGA require consideration of many of the same elements.  The Court first addresses the matters that pertain to its review of the proposed settlement for the California class under Rule 23, and then addresses the additional matters that pertain to its review of the proposed settlements for the FLSA collective and PAGA members.

#### 1.  Rule 23

Under Rule 23(e), review of a proposed settlement of a class action proceeds in two steps. Fed. R. Civ. P. 23(e); *Lusby v. Gamestop, Inc.*, 297 F.R.D. 400, 412 (N.D. Cal. 2013).  First, the Court conducts a preliminary fairness evaluation.  If the Court preliminarily approves the settlement, then notice to the class is disseminated and the Court sets a final hearing for approval of the settlement.  *Lusby*, 297 F.R.D. at 412.  Ultimately, a settlement should only be approved if it is "fair, reasonable and adequate."  Fed. R. Civ. P. 23(e)(2).  In determining whether a proposed settlement meets this standard, the Court does not have "the ability to delete, modify, or substitute certain provisions," and "[t]he settlement must stand or fall in its entirety."  *Staton*, 327 F.3d at 969 (cleaned up).  The Court's evaluation of a settlement reached prior to class certification "requires a higher standard of fairness and a more probing inquiry than may normally be required

1  under Rule 23(e)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (cleaned up).

2      The Ninth Circuit has described several factors a court may consider in evaluating the

3  fairness of a proposed settlement:

> [1] the strength of the plaintiffs' case; [2] the risk, expense,
> complexity, and likely duration of further litigation; [3] the risk of
> maintaining class action status throughout trial; [4] the amount
> offered in settlement; [5] the extent of discovery completed and the
> stage of the proceedings; [6] the experience and views of counsel;
> [7] the presence of a governmental participant; and [8] the reaction
> of the class members to the proposed settlement.

*Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting *Hanlon*, 150 F.3d at

1011). Rule 23(e)(2) requires a court to consider a similar list of factors before approving a

settlement, including whether:

> (A) the class representatives and class counsel have adequately
>     represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>     the costs, risks,
>     (i)   the costs, risks, and delay of trial and appeal;
>     (ii)  the effectiveness of any proposed method of distributing
>           relief to the class, including the method of processing
>           class-member claims;
>     (iii) the terms of any proposed award of attorney's fees,
>           including timing of payment; and
>     (iv)  any agreement required to be identified under Rule
>           23(e)(3); and
> (D) the proposal treats class members equitably relative to each
>     other.

Fed. R. Civ. P. 23(e). This list of factors is not intended to displace any factors identified by

courts, "but rather to focus the court and the lawyers on the core concerns of procedure and

substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)

advisory committee note to 2018 amendment; *see also McKinney-Drobnis v. Oreshack*, 16 F.4th

594, 609 (9th Cir. 2021) ("The amended Rule 23(e) did not 'displace' this court's previous

articulation of the relevant factors, and it is still appropriate for district courts to consider these

factors in their holistic assessment of settlement fairness."); *Kim v. Allison*, 8 F.4th 1170, 1178-79

(9th Cir. 2021) (directing district courts to consider both the factors previously identified by the

Ninth Circuit and Rule 23(e)(2) when determining whether to approve a settlement). However,

18

1   "the district court must show it has explored comprehensively all Rule 23(e)(2) factors." *In re*

2   *Apple Inc. Device Performance Litig.*, 50 F.4th 769, 782 (9th Cir. 2022) (cleaned up).

3       Additionally, the Northern District of California has published procedural guidance for

4   class action settlements, which includes guidelines for parties seeking preliminary approval of

5   class action settlements ("Guidelines").  *See* https://www.cand.uscourts.gov/forms/procedural-

6   guidance-for-class-action-settlements/.  These guidelines identify information that is often helpful

7   to district courts in when assessing whether a class action settlement satisfies the standards

8   identified above.

9

          a.      **Strength of plaintiff's case and the risk, expense, complexity,**
10                 **and likely duration of further litigation**

11      The Court faulted Mr. Rodriguez's original motion for preliminary approval for failing to

12  "address in any meaningful way the strength of plaintiff's state law, FLSA, and PAGA claims, or

13  how defendants' defenses and other factors bear on the Court's assessment of whether the

14  proposed resolution of each set of claims is 'fair, adequate, and reasonable.'"  Dkt. No. 44 at 3

15  (quoting Fed. R. Civ. P. 23(e)(2)).  In response, Mr. Rodriguez filed a supplemental submission

16  and supporting declaration describing the litigation risks the California class faces on a claim-by-

17  claim basis.  *See* Dkt. No. 47-2.

18      The supplemental materials identify several areas of litigation risk.  Mr. Rodriguez

19  suggests that defendants may have viable legal defenses to some of his claims.  For example,

20  defendants could argue that the drug tests and physical examinations at issue in the class's

21  minimum wage claim were not "work" because defendants did not exercise control over the class

22  members during the tests and examinations.  Dkt. No. 47-2 ¶ 6; *see also Morillion v. Royal*

23  *Packing Co.*, 22 Cal. 4th 575, 587 (2000) ("The level of the employer's control over its

24  employees, rather than the mere fact that the employer requires the employees' activity, is

25  determinative. ").

26      Mr. Rodriguez also acknowledges that several of his claims may be difficult to prove.  For

27  example, evidence that class members did not take required meal and rest breaks likely would not

28  be sufficient to establish defendants' liability with respect to the meal and rest period claims;

United States District Court
Northern District of California

rather, to succeed, the class would be required to prove that members were "*forced to forego*" their breaks.  *See* Dkt. No 47-2 ¶¶ 11-2, 14-16 (quoting *Nguyen v. Baxter Healthcare Corp.*, No. 10-cv-01436-CJC, 2011 WL 6018284, at *5 (C.D. Cal. Nov. 28, 2011)); *see also Brinker Rest. Corp. v. Superior Ct.*, 53 Cal. 4th 1004, 1034 (2012) (under California law, "an employer must relieve the employee of all duty for the designated period, but need not ensure that the employee does no work").  Similarly, defendants would be liable on the business expense claims "only if [the class] can prove that the employer knew or had reason to know that actual expenses were incurred."  Dkt. No. 47-2 ¶ 19; *see also Wilson v. La Jolla Grp.*, 61 Cal. App. 5th 897, 919 (2021) (quoting *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009)) ("[B]efore an employer's duty to reimburse is triggered, it must either know or have reason to know that the employee has incurred an expense.").

Additionally, Mr. Rodriguez observes that developing evidence to support class-wide application of the allegedly unlawful practices would be difficult.  Several of Mr. Rodriguez's claims rest on allegations that defendants engaged in unofficial, unwritten practices, which contradicted their official, written policies.  *See, e.g.*, Dkt. No. 47-2 ¶¶ 5-7 (discussing defendants' off-the-clock work policy).  It is far more challenging to establish the existence an uniformity of such practices as the basis for class claims than it is to establish the existence an uniformity of an official written policy as the basis for such claims.  *See, e.g.*, *Galvan v. First Student Mgmt., LLC*, No. 18-cv-07378-JST, 2022 WL 20016825 *6 (N.D. Cal. Aug. 23, 2022); *Moore v. Addus Healthcare, Inc.*, No. 19-cv-01519-HSG, 2021 WL 1022875, at *10 (N.D. Cal. Mar. 17, 2021); *Clemens v. Hair Club for Men, LLC*, No. 15-cv-01431 WHA, 2016 WL 1461944, at *6 (N.D. Cal. Apr. 14, 2016) (all denying motions for class certification in wage-and-hour cases after plaintiffs failed to prove the existence of uniform unwritten policies).

These considerations suggest that the California class would face meaningful litigation risk—on the merits and on class certification—if the case were to proceed.  At the very least, collecting evidence to prove these claims would be expensive and complicated.  In these circumstances, achieving a resolution at an early stage of the case is likely a favorable outcome for the California class.  *See Burgos v. Sunvalleytek Int'l, Inc.*, No. 18-cv-06910-HSG, 2020 WL

7319354, at *7 (N.D. Cal. Dec. 11, 2020) (settlement is preferable when "additional litigation would have, in the best-case scenario, been expensive and time-consuming—and in the worst-case scenario, could have led to Plaintiff and the class going home empty-handed"); *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014) (same when "Plaintiff [had] identified several meritorious arguments that Defendants could raise to class certification in the event this lawsuit was to proceed"),

Thus, this factor weighs in favor of preliminary approval of the settlement.

### b. Amount offered in settlement

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) (cleaned up). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (cleaned up).

Mr. Rodriguez estimates that the maximum total value of the California class's claims is $5,411,143.53. Dkt. No. 39 at 20. In his supplemental submission, he breaks this figure down on a claim-specific basis as follows:

| Claim | Value (classwide) |
|---|---|
| Minimum Wage (drug testing) | $10,547.90 |
| Minimum Wage (understaffing) | $1,000,294.38 |
| Meal Period | $800,235.50 |
| Rest Period | $800,235.50 |
| Business Expense | $89,712.50 |
| Reporting Time | $400,117.75 |
| Wage Statements | $675,000.00 |
| Final Pay | $1,338,000.00 |
| Total | $5,114,143.53 |

Dkt. No. 47-2 ¶¶ 4, 5, 10, 14, 18, 21, 23, 26.

The settlement agreement allocates $465,000 to the California class for these claims. *Id.*

United States District Court
Northern District of California

¶ 41.  This amount represents approximately 9% of the maximum total value.  Mr. Rodriguez does not indicate the range of payments that the class members could expect to receive under the amended settlement.[2]  Given the litigation risks and other considerations discussed above, the proposed amount, while only a fraction of the estimated maximum total value, is not necessarily inadequate, but it is lower than other approved settlements in similar cases.  *See, e.g.*, *Uschold v. NSMG Shared Servs., LLC*, No. 18-cv-01039-JSC, 2020 WL 3035776, *29 (N.D. Cal. June 5, 2020) (approving settlement where net settlement amount reflected a 12% recovery of potential damages); *Bellinghausen*, 306 F.R.D. at 256 (approving wage-and-hour class action settlement where gross settlement amount was between 11% and 27% of plaintiffs' potential recovery).

On the present record, and in view of the discussion below regarding the FLSA collective settlement, the Court cannot conclude that the amount allocated to resolve the claims of the California class as part of the "whole package" favors preliminary approval of the settlement.

### c.   Extent of discovery completed and the stage of the proceedings

The parties settled at a relatively early stage in this case, with no substantive proceedings other than an initial motion to dismiss.  *See* Dkt. No. 15.  Mr. Rodriguez's counsel reported receiving "a considerable amount of documents and data" in discovery.  Dkt. No. 39-1 ¶ 8.  However, at the hearing, counsel clarified that defendants' disclosure was limited to their policy manuals, and timesheet and earnings data for all potential class members during the class period.  Dkt. No. 43.  However, the lack of extensive discovery, by itself, is not a bar to settlement inasmuch as there is no indication that the parties were insufficiently prepared to engage in an informed discussion of a settlement of the action or to properly assess how the settlement might compare to the outcome of the litigation were it to proceed.  *See Linney*, 151 F.3d at 1239.

This factor weighs in favor of preliminary approval of the settlement.

### d.   Adequate representation and equitable treatment

The proposed settlement raises some issues regarding the adequacy of Mr. Rodriguez's

---

[2] In his original motion, Mr. Rodriguez reported that members of the California class would receive an average of $1,014.80 under the terms of the original settlement agreement.  Dkt. No. 39 at 5.

United States District Court
Northern District of California

representation of the class and the equitable treatment of the different employee categories.

Incentive award.  The agreement allows for Mr. Rodriguez to apply for an enhancement or incentive award of $10,000, which he would receive in addition to the payment he would otherwise be entitled to as a member of the settlement class.  Dkt. No. 47-2 at ECF 26 (¶ 42). Such awards, which are "fairly typical in class action cases," are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). However, because incentive awards may also "corrupt the settlement by undermining the adequacy of the class representatives and class counsel," "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

Here, there appears to be a significant disparity between the proposed $10,000 incentive award and the payments to the rest of the class, which Mr. Rodriguez previously indicated would average around $1,000.  *Id.* at 1165; Dkt. No. 39 at 5.  This proposed award may be reasonable, taking into account "the number of class representatives, the average incentive award amount, and the proportion of the total settlement that is spent on incentive awards," *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015), as well as "the actions plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation and reasonable fears of workplace retaliation," *Staton*, 327 F.3d at 977.

Mr. Rodriguez's incentive award must be approved by the Court and is not guaranteed. Dkt. No. 47-2 at ECF 26 (¶ 42).  Prior to granting that approval, the Court will closely scrutinize Mr. Rodriguez's contributions on behalf of the class and determine whether the award he requests is reasonable.  *See Jarrell v. Amerigas Propane, Inc.*, No. 16-cv-01481-JST, 2018 WL 1640055, at *4 (N.D. Cal. Apr. 5, 2018) (rejecting class representative's application for a $10,000 service award when his involvement in the lawsuit did not "go beyond what would be expected of any class representative," " was not a current employee during the pendency of this lawsuit and

therefore did not risk retaliation," and the award in question was "more than the average class recovery before fees, and more than double the average class recovery after fees"). The Court concludes that the parties' agreement to allow Mr. Rodriguez to apply for an incentive award of $10,000 does not prevent Mr. Rodriguez from adequately representing the interests of the class.

Allocation of funds. At the hearing and in its order requesting a supplemental submission, the Court directed Mr. Rodriguez to provide additional explanation of "how the parties chose to allocate settlement funds to each set of claims." Dkt. No. 43; Dkt. No. 44 at 3. In his supplemental materials, Mr. Rodriguez reports the estimated and settlement values of the California class, FLSA collective, and PAGA claims as follows:

| Claim | Estimated Value | Settlement Value | Recovery |
|-------|----------------|------------------|----------|
| Class | $5,114,143.53 (~69%) | $465,000.00 (~64%) | 9.09% |
| FLSA | $1,258,000.00 (~18%) | $165,000.00 (~23%) | 13.12% |
| PAGA | $1,012,500.00 (~13%) | $100,000.00 (~13%) | 9.88% |
| Total | $7,384,643.53 (100%) | $730,000.00 (100%) | 9.89% |

Dkt. No. 47-2 ¶ 41.[3] As the chart above reflects, the settlement allocates money to the class, FLSA, and PAGA claims in close proportion to Mr. Rodriguez's estimates of their value. Notably, these figures reflect the assumption that (1) 25% of the total FLSA collective would opt in to the settlement agreement, see id. ¶ 39, and (2) the Court would award only 25% of the total possible PAGA penalties, see id. ¶ 36. As discussed in sections IV.B.2.a and IV.B.3, these assumptions require further explanation.

On the current record, the Court cannot determine whether this factor weighs in favor of or against preliminary approval of the settlement.

### e.    Potential for collusion and attorneys' fees award

Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain

---

[3] Here, Mr. Rodriguez says that—assuming only 25% of the collective opts in—defendants' total estimated exposure on the FLSA claim is $1,012,500. Dkt. No. 47-2 ¶ 41. However, that figure appears to be an error, as he estimates that the claim is worth $1,258,000.00 elsewhere in his submission and this number aligns with his explanation that the FLSA claim represents of 18% of the total estimated exposure. See id. ¶¶ 39, 41.

class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. Such signs include (1) class counsel's receipt of a disproportionate distribution of the settlement, (2) a "clear sailing" agreement "providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) an arrangement whereby fees that are not awarded are reverted to the defendants, rather than added to the class fund. *Id.*

The settlement agreement provides for an attorneys' fee award of up to $400,000, which represents 33.33% of the gross settlement amount. Dkt. No. 39-1 at ECF 17-18 (¶ 41). The proposed award gives the Court pause. The Ninth Circuit has held that an award representing 25% of a common settlement fund is a "benchmark" for a reasonable fee award, unless special circumstances warrant a departure. *See In re Bluetooth*, 654 F.3d at 942; *Staton*, 327 F.3d at 968; *Fischel v. Equitable Life Assur. Society*, 307 F.3d 997, 1006-07 (9th Cir. 2002); *see also Vigil v. Hyatt Corp.*, No. 22-cv-00693-HSG, 2024 WL 2137640, at *7-9 (N.D. Cal. May 13, 2024) (describing why fee award above 25% benchmark was not warranted). While the present record does not support an award of fees greater than 25% of the gross settlement amount, the settlement agreement contemplates that any award of fees will be the subject of a separate motion, and thus the matter need not be addressed conclusively at the preliminary approval stage.

The Court notes that the parties reached this agreement after participating in mediation, which suggests that their negotiations were conducted at arm's length. Dkt. No. 39-1 ¶ 4. The settlement agreement provides that the funds from settlement checks which are returned as undeliverable or that remain uncashed 180 days after final approval will be donated to Worksafe. Dkt. No. 47-2 at 34 (¶ 69). The Court asked the parties to provide additional information about this cy pres recipient. *See* Dkt. No. 44 at 4. In response, Mr. Rodriguez's counsel reports that "Worksafe is a California-based organization dedicated to promoting and protecting workplace safety" which "advocates for strong occupational safety and health (OSH) protections for workers" and "promotes access to justice for low-wage and immigrant workers by providing free legal training and technical assistance to legal aid programs, worker advocacy groups, and

1    unions." Dkt. No. 47-2 ¶ 43.  He also represents that Worksafe has no affiliation with class

2    counsel.  *Id.* ¶ 45.  Based on these representations, it appears that Worksafe's mission "bears a

3    substantial nexus to the interests of the class members," *see Lane v. Facebook, Inc.*, 696 F.3d 811,

4    821 (9th Cir. 2012), and the Court finds no indication of possible collusion, *see In re Bluetooth*,

5    654 F.3d at 947.

6         As the Court has identified no indicia of collusion in the settlement agreement, this factor

7    weighs in favor of preliminary approval of the settlement.

8                         **f.        Adequacy of notice and plan for distribution**

9         Rule 23(c)(2)(B) provides that for any class certified under Rule 23(b)(3), the Court must

10   direct to class members the best notice that is practicable under the circumstances, including

11   individual notice to all members who can be identified through reasonable effort.  Specifically,

12   "[t]he notice must clearly and concisely state in plain, easily understood language: (i) the nature of

13   the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv)

14   that a class member may enter an appearance through an attorney if the member so desires; (v)

15   that the court will exclude from the class any member who requests exclusion; (vi) the time and

16   manner for requesting exclusion; and (vii) the binding effect of a class judgment under Rule

17   23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).

18        <u>Proposed notice</u>.  The proposed notice for the California class contains all of the

19   information required by Rule 23(c)(2)(B) and suggested by the Guidelines, and also describes the

20   PAGA settlement.  Dkt. No. 47-2 at ECF 43-47; Guidelines § 4.  However, while the notice

21   acknowledges the existence of the separate FLSA collective, it does not indicate whether or to

22   what extent there is overlap between the California class and the FLSA collective, nor does it

23   indicate that separate procedures govern participation in each settlement.  The Court questions

24   whether, to avoid unnecessary confusion, the notice should be revised to inform class members

25   that they may also be members of the FLSA collective and that they must take additional steps to

26   opt in to enjoy the benefits of the settlement for the FLSA collective.[4]

27   _____

28   [4] Additionally, the notice refers to a "$10,000 PAGA Fund" on page 3, which appears to be a
     typographical error.  Dkt. No. 47-2 at ECF 45.

United States District Court
Northern District of California

1   The Court discusses the FLSA notice separately in section IV.B.2.b.

2   At the hearing, Mr. Rodriguez's counsel represented that the settlement administrator's bid

3   provided for a Spanish translation of the class notice to be sent to class members at their request.

4   Dkt. No. 43. If this is in fact the case, the English language notice should be revised to advise

5   class members, in Spanish, of the availability of a Spanish translation.

6   Plan for distribution. The settlement agreement provides for written notice to absent class

7   and collective members by means of first-class mail. Dkt. No. 47-2 at ECF 29 (¶ 53). The Ninth

8   Circuit has cautioned that in this digital age, a single mailed notice may fall short of "the best

9   notice that is practicable under the circumstances." *See SFBSC Mgmt.*, 944 F.3d at 1045-48

10  (notice by mail was not "best notice practicable" when "at least 12% of the mailed notices were

11  ultimately determined to be undeliverable," even after settlement administrator performed address

12  traces, and "no additional means of notice reasonably calculated to reach those class members was

13  attempted"). At the hearing, defendants' counsel confirmed that defendants have email addresses

14  for most, if not all, relevant employees. Dkt. No. 43. Mr. Rodriguez's counsel suggested that

15  notice by mail would be effective, in view of the available tools for tracing changes in members'

16  addresses. *Id.*

17  Based on counsel's representations, the Court is satisfied that notice by mail provides the

18  best notice practicable in the first instance. However, if a notice remains undeliverable by mail

19  even after a trace is done, the Court's expects the settlement administrator to attempt to deliver

20  notice by email if defendants have that member's email address.

21  Settlement administrator. Noting that the settlement administrator would be provided with

22  employees' sensitive personal information, the Court asked for additional information regarding

23  the administrator's data security practices. Dkt. No. 44 at 3; *see also* Guidelines § 2(b). Mr.

24  Rodriguez has now filed the declaration of Julie Green, Senior Vice President of Operations, Class

25  Action Services for CPT Group, the proposed settlement administrator, describing the steps CPT

26  Group takes to protect employees' data and representing that it holds insurance policies to

27  compensate class members in the case of loss. Dkt. No. 47-1 ¶¶ 9-10. The Court is satisfied that

28  these practices provide an adequate safeguard for employees' personal information.

United States District Court
Northern District of California

1        <u>Exclusions and objections</u>.  The settlement agreement provides class members 45 days

2    from the mailing of notices to opt out or object to the settlement in writing and collective members

3    with the same amount of time to opt in to the settlement.  Dkt. No. 47-2 at ECF 24 (¶¶ 34-35).

4    Either group may do so by mail or by email.  *Id.*  These procedures appear sufficient to ensure that

5    class members receive an adequate opportunity to opt out or object.

6                                            * * *

7        After consideration of the factors identified by the Ninth Circuit and in Rule 23(e)(2), the

8    Court concludes that it cannot determine whether the proposed settlement agreement is "fair,

9    reasonable and adequate" with respect to the California class, and therefore denies preliminary

10   approval at this time.  Fed. R. Civ. P. 23(e)(2).

11           **2.**        **FLSA Collective**

12                 **a.**        **Fair and reasonable resolution**

13       "'[T]he Ninth Circuit has not established the criteria that a district court must consider in

14   determining whether an FLSA settlement warrants approval.'"  *Kulik*, 2023 WL 2503539, at *3

15   (quoting *Otey*, 2014 WL 1477630, at *3).  In the absence of guidance, most district courts in the

16   Ninth Circuit apply a test developed by the Eleventh Circuit and assess whether the proposed

17   settlement is "a fair and reasonable resolution of a bona fide dispute over FLSA provisions."

18   *Otey*, 2014 WL 1477630, at *3 (quoting *Lynn's Food Stores*, 679 F.2d at 1355); *see also Kulik*,

19   2023 WL 2503539, at *3; *De Leon v. Ricoh USA, Inc.*, No. 18-cv-03725-JSC, 2020 WL 1531331,

20   at *7 (N.D. Cal. Mar. 31, 2020).  To make this determination, "district courts implicitly or

21   explicitly consider the factors that are used to evaluate Rule 23 class action settlements."  *Otey*,

22   2014 WL 1477630, at *4.

23       Mr. Rodriguez estimates the maximum total value of the FLSA claim is $5,032,000 for the

24   entire collective, assuming that the collective members worked an average of half an hour of

25   unpaid overtime each workweek they worked for defendants.  Dkt. No. 47-2 ¶ 38.  Because the

26   settlement allocates $165,000 to the FLSA claim regardless of the number of collective members

27   who opt in, an individual member's recovery will vary depending on the number of opt-ins and the

28   corresponding share of the workweeks during the FLSA period.  Mr. Rodriguez suggests that the

United States District Court
Northern District of California

typical opt-in rate for FLSA collective actions is between 14% and 25%.  Dkt. No. 47-2 ¶ 39.
However, he provides the Court with no information about the expected range of recoveries or
average recovery for individual collective members under the amended settlement.  It appears,
however, that even if only 14% of the FLSA collective members opt in, each member will recover
only a small fraction of the maximum total value of his or her claim.  *See Slavkov v. Fast Water
Heater Partners I, LP*, No. 14-cv-04324-JST, 2017 WL 3834873, at *1 (N.D. Cal. July 25, 2017)
("In this district, courts have concluded that settlements are reasonable when they equal between
70% and 100% of a plaintiff's FLSA damages.").  Mr. Rodriguez does not explain why the
settlement of the FLSA claim discounts the collective members' expected recovery. *See* Dkt. No.
47-2 ¶¶ 38-40.  While he suggested at the hearing that there might be some overlap between the
California class members' state law and FLSA claims that could justify a discount of the latter, the
same is not true for collective members located outside of California.  Dkt. No. 43.  The Court
might infer that the FLSA collective faces many of the same risks on the merits as does the
California class.  However, because Mr. Rodriguez does not adequately address this point in his
original motion or his supplemental materials, the Court cannot conclude that the proposed
settlement of the FLSA claim is fair and reasonable..

Moreover, the Court notes that Mr. Rodriguez does not include liquidated damages in his
calculations of the estimated value of the FLSA claim.  In addition to unpaid overtime pay, the
FLSA allows successful plaintiffs to recover liquidated damages in the amount of their unpaid
overtime pay, doubling their recovery.  29 U.S.C. § 216(b).  "[C]ourts retain discretion to withhold
a liquidated damages award, or to award less than the statutory liquidated damages total, where an
employer shows that, 'despite the failure to pay appropriate wages, the employer acted in
subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or
omissions giving rise to the failure did not violate the FLSA.'"  *Alvarez v. IBP, Inc.*, 339 F.3d 894,
909 (9th Cir. 2003) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999)).
However, because this is a "difficult" standard to meet, "'[d]ouble damages are the norm; single
damages are the exception.'"  *Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014)
(quoting *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003)).  Some courts have

been willing to approve FLSA settlements that discount liquidated damages when provided with an explanation for that discount.  *See Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1174-75 (S.D. Cal. 2016) (approving discount to liquidated damages because "discovery suggested a lack of bad intent on the part of [defendant]").  Conversely, other courts have rejected settlements that fail to consider or assign any value to liquidated damages.  *See Bakhtiar v. Info. Res., Inc.*, No. 17-cv-04559-JST, 2020 WL 11421997, at *10 (N.D. Cal. Jan. 30, 2020) (denying approval of settlement because plaintiff's "estimates of the settlement class members' potential recovery . . . [did] not take into account penalties or liquidated damages"); *Kerzich v. Cnty. of Tuolumne*, 335 F. Supp. 3d 1179, 1190-91 (E.D. Cal. 2018) ("[W]hile some discounting of liquidated damages might be warranted in light of the settlement, completely excluding liquidated damages from the calculation of potential damages here is most likely inappropriate.").

The proposed settlement of the FLSA collective claim may be fair and reasonable.  However, Mr. Rodriguez's current submission does not establish that this is the case.

### b.      Notice and consent to magistrate judge jurisdiction

The parties' proposed notice and opt-in form allow members of the FLSA collective to give "consent in writing to become [parties to the suit.]" 29 U.S.C. § 216(b); Dkt. No. 47-2 at ECF 53 (form).  However, the notice does not advise FLSA collective members about magistrate judge jurisdiction, and the form does not provide for members of the collective to consent to magistrate judge jurisdiction, which is necessary if this Court will be asked to enter final judgment on their claims.  *See* 28 U.S.C. § 636(c)(1).

The Ninth Circuit has held that all parties, meaning "all plaintiffs and defendants named in the complaint," must consent to the jurisdiction of a magistrate judge before the judge acts on a dispositive matter, *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017), but also that "Congress did not intend absent class members to be treated as parties in this context," *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1076 (9th Cir. 2017).  Separately, the Ninth Circuit has emphasized the difference between an FLSA collective and a Rule 23 class:  "A collective action is more accurately described as a kind of mass action, in which aggrieved workers act as a collective of *individual* plaintiffs with *individual* cases—capitalizing on efficiencies of scale, but without

United States District Court
Northern District of California

30

1   necessarily permitting a specific, named representative to control the litigation, except as the

2   workers may separately so agree. . . . [Plaintiffs who join the collective hold] 'the same status in

3   relation to the claims of the lawsuit as that held by the original named plaintiffs.'" *Campbell v.*

4   *City of Los Angeles*, 903 F.3d at 1105 (9th Cir. 2018) (quoting *Prickett v. DeKalb Cnty.*, 349 F.3d

5   1294, 1297 (11th Cir. 2003)) (cleaned up, emphasis in original).

6          The preliminary or conditional certification of an FLSA collective is not dispositive of the

7   collective members' claims, so the there is no jurisdictional issue posed by the Court's decision on

8   this motion. *See Lescinsky v. Clark Cnty. Sch. Dist.*, 539 F. Supp. 3d 1121, 1125 (D. Nev. 2021);

9   *Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193, 197 n.1 (D.D.C. 2018) (both collecting cases);

10  *see also Anderson v. Woodcreek Venture Ltd.*, 351 F.3d 911, 917 (9th Cir. 2003) (a "magistrate

11  judge's jurisdiction over any *pretrial nondispositive* matters . . . is not contingent on litigant

12  consent") (emphasis in original); *Campbell v. City of Los Angeles*, 903 F.3d at 1109-10 (noting

13  that the denying certification of an FLSA collective is "without prejudice to the merits of [the opt-

14  in plaintiffs'] individual claims").  However, the Court may not enter final judgment on the claims

15  of the collective members who opt in without first obtaining their consent.

16         While different magistrate judges in this district have dealt with this issue in different

17  ways, the Court concludes that the best course of action is to ask members of the FLSA collective

18  to consent to or decline magistrate judge jurisdiction at the same time the member opts in to the

19  settlement.  *See, e.g.*, *Chavez v. Stellar Management Group VII, LLC*, No. 19-cv-1353-JCS, Dkt.

20  No. 115-1 (N.D. Cal.) (FLSA opt-in form including consent to magistrate judge jurisdiction).

21  Accordingly, the parties must amend the proposed notice and opt-in form to include a requirement

22  that the member indicate whether he or she consents to or declines magistrate judge jurisdiction.

23                                          * * *

24         Given the issues identified above, the Court denies preliminary approval of the FLSA

25  collective portion of the settlement.

26                 **3.      PAGA Settlement**

27         A reviewing court must ensure that a PAGA settlement "(1) meet[s] the statutory

28  requirements set forth by PAGA, and (2) [is] fundamentally fair, reasonable, and adequate in view

1    of PAGA's public policy goals." *Kulik*, 2023 WL 2503539, at \*4.

2           It is not clear whether the proposed settlement complies with all of PAGA's statutory

3    requirements.  First, while the agreement allocates 75% of the PAGA settlement amount to

4    LWDA as civil penalties, as required by the statute, Cal. Lab. Code. § 2699(i); Dkt. No. 47-2 at

5    ECF 22-23 (¶ 25), the parties have not indicated whether they submitted their amended settlement

6    agreement to LWDA.  *See* Cal. Lab. Code. § 2699(l)(2); Dkt. No. 39-2 (addressing submission of

7    original settlement agreement).  If they have not done so already, the parties must submit the

8    amended settlement agreement to LWDA, and file proof of the submission with the Court.

9           Second, it is also unclear whether the PAGA settlement is fair, reasonable, and adequate in

10   view of PAGA's public policy goals.  PAGA provides that "any provision of [the California Labor

11   Code] that provides for a civil penalty to be assessed and collected by [LWDA] for a violation of

12   [the Labor Code], may, as an alternative, be recovered through a civil action brought by an

13   aggrieved employee." Cal. Lab. Code § 2699(a).  It also establishes a default civil penalty of $100

14   per aggrieved employee per pay period for an initial violation and $200 for subsequent

15   violations—although the latter provision applies only if employer is notified by a state agency or

16   court that it is in violation of the labor code. *Id.* § 2699(f)(2); *Gunther v. Alaska Airlines, Inc.*, 72

17   Cal. App. 5th 334, 356 (2021).

18          Mr. Rodriguez estimates that the aggrieved employees in the PAGA class worked

19   approximately 13,500 pay periods during the class period.  Dkt. No. 47-2 ¶ 31.  He also estimates

20   that 250 pay periods are implicated by the final pay claim. *Id.* ¶ 32.  Based on these estimates, Mr.

21   Rodriguez estimates that the maximum total value of the PAGA claim is $4,737,500, assuming

22   that the PAGA penalties "stack" on other statutory penalties. *Id.* ¶¶ 32-33.  However,

23   acknowledging that other courts have disagreed about the availability of "stacking," he suggests

24   that defendants' maximum exposure is more likely $4,050,000, after PAGA penalties for the wage

25   statement and final pay claims are subtracted. *Id.* ¶ 33; *see also Hamilton v. Juul Labs, Inc.*, No.

26   20-cv-03710-EMC, 2021 WL 5331451, at \*9 (N.D. Cal. Nov. 16, 2021); *Morales v. Garfield*

27   *Beach CVS, LLC*, No. B312212, 2024 WL 356877, at \*13 (Cal. App. Jan. 31, 2024) (both noting

28   uncertainty regarding the availability of stacking).

United States District Court
Northern District of California

1    The Court questions the assumptions underlying Mr. Rodriguez's $4,050,000 estimate.

2    First, Mr. Rodriguez appears to commit a simple mathematical error by multiplying the number of

3    pay periods at issue by $50, rather than $100, when calculating the total possible PAGA penalties.

4    *See* Dkt. No. 47-2 ¶ 32.  As a result, he estimates the total potential penalties for each of the six

5    violations he asserts to be $675,000, rather than $1,350,000—i.e., *half* their potential value.  *Id.*

6    Second, he assesses separate penalties for defendants' alleged minimum wage and overtime

7    violations, despite analyzing these claims together when estimating damages.  *See id.* ¶¶ 2, 32.

8    Thus, it appears that Mr. Rodriguez may have substantially underestimated the maximum total

9    value of the PAGA claim.

10    Mr. Rodriguez then assumes that this Court would likely exercise its discretion to award

11    only 25% of the maximum total potential penalties, or $1,012,500.  *Id.* ¶ 36; Cal. Lab. Code

12    § 2699(e)(2) ("[A] court may award a lesser amount than the maximum civil penalty amount

13    specified by this part if, based on the facts and circumstances of the particular case, to do

14    otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory.").

15    Under PAGA, "a court can only exercise its discretion *to award lesser penalties* based on the

16    enumerated considerations [in § 2699(e)(2).]" *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th

17    1157, 1213 (2008) (emphasis in original).  In his supplemental materials, Mr. Rodriguez cites

18    cases in which other courts awarded PAGA penalties far below the maximum amount permitted

19    by the statute, *see* Dkt. No. 47-2 ¶¶ 34-36 (citing *Carrington v. Starbucks Corp.*, 30 Cal. App. 5th

20    504 (2018) and *Fleming v. Covidien Inc.*, No. 10-cv-01487 RGK (OPx), 2011 WL 7563047 (C.D.

21    Cal. Aug. 12, 2011)), but he does little to explain why such a reduction is warranted in this case,

22    *see Boddie v. Signature Flight Support Corp.*, No. 19-cv-03044-DMR, 2021 WL 2651369, at *7

23    (N.D. Cal. June 28, 2021) (stating that the *Carrington* and *Fleming* cases cited by Mr. Rodriguez,

24    "in which the courts significantly reduced the amount of PAGA penalties following bench trials,

25    [were] distinguishable" from settlement before the court).  At the hearing, Mr. Rodriguez's

26    counsel indicated that he believed that PAGA penalties should be substantially discounted here

27    because of evidence that defendants' labor law violations were not willful.  Dkt. No. 43; *see also*

28    *Carrington*, 30 Cal. App. 5th at 529 (affirming reduction in PAGA penalties because of

United States District Court
Northern District of California

defendant's "good faith attempts" to comply with labor law).  While this consideration might constitute an adequate explanation for discounting a penalty award here, the record on this point is insufficiently developed.  *See Maciel v. Bar 20 Dairy, LLC*, No. 17-cv-00902-DAD, 2020 WL 5095885, at *15 (E.D. Cal. Aug. 28, 2020) (noting that *Carrington* approved significant reduction in PAGA penalties, but cautioning that "this does not mean that plaintiffs are entitled to base their estimate of potential PAGA exposure on one state trial court's exercise of discretion in one case").

Finally, the settlement only awards $100,000 in PAGA penalties, less than 10% of the reduced amount ($1,012,500) that Mr. Rodriguez discusses, meaning that the settlement actually awards less than 2.5% of his estimated maximum of $4,050,000.  While this discount may be reasonable in light of the circumstances presented, Mr. Rodriguez again fails to establish this is the case.

The Court must consider the fairness of a PAGA settlement "as a whole," including the fairness of any related Rule 23 class settlements.  *O'Connor*, 201 F. Supp. 3d at 1134.  "[I]f the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled." *Id.*  However, the Court has already raised questions about the California class settlement.  Given that these questions remain outstanding, the Court cannot conclude that the settlement as a whole accomplishes PAGA's policy goals..

As with the FLSA collective settlement, the PAGA settlement may be fair and reasonable, but Mr. Rodriguez has not shown that it is.

## V.  CONCLUSION

For the reasons described above, the Court denies Mr. Rodriguez's motion for preliminary approval of the settlement agreement.  This denial is without prejudice to the filing of an amended motion for preliminary approval addressing the issues identified in this order.  Mr. Rodriguez shall file an amended motion for preliminary approval no later than **July 12s, 2024**; alternatively, the parties shall file a joint status report on that date.

**IT IS SO ORDERED.**

//

//

Dated: June 13, 2024

VIRGINIA K. DEMARCHI
United States Magistrate Judge